## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MELANIE HIGGINS, | ) |
| | ) |
| Plaintiff, | ) |
| | )     CIVIL ACTION NO. 3:2006-207 |
| v. | ) |
| | ) |
| MOSHANNON VALLEY SCHOOL | )     JUDGE GIBSON |
| DISTRICT, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on the Defendant's Motion for Summary Judgment (Document No. 23), its Memorandum in Support (Document No. 24) and the Plaintiff's Motion for Summary Judgment (Document No. 26) and Plaintiff's Brief in Response (Document No. 27). For the reasons stated herein, the Defendant's motion is granted.

The Court has jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 626(c) and supplemental jurisdiction over the state law claim is established pursuant to 28 U.S.C. § 1367(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and (c).

### UNDISPUTED FACTUAL HISTORY

The following are the undisputed facts of record in the case *sub judice*.[1]

---

[1] The following facts are based upon the Defendant's Concise Statement of Undisputed Material Facts (Document No. 23) and the Plaintiff's Response thereto (Document No. 47) and the Plaintiff's Concise Statement of Material Facts (Document No. 42) and the Defendant's Response thereto (Document No. 45). The submissions of the parties were used with any additions to a proposed material fact or any additional proposed material fact in the record but not offered by the

1.  In the summer of 2005, Plaintiff, Melanie Higgins ("Higgins") applied to [be considered for] three elementary school positions which were available in the Moshannon Valley School District ("District").

2.  Higgins submitted letters of interest and an application to District Elementary School Principal Thomas Snyder ("Snyder") and Superintendent Dr. Michael Slavinski for the three open positions in 2005-2006. Higgins' applications packet included her letter of application, resume, standard application, transcripts, certifications, clearances, and reference letters.

3.  In the Spring and Summer of 2005, the times relevant to this action, [Higgins was 48 years old].

4.  The [District] is a public educational provider located at 4934 Green Acre Road, Houtzdale, Clearfield County, Pennsylvania, 16651.

5.  On or about June 7, 2005, Higgins applied for two open permanent second grade positions and one long-term sixth grade substitute teaching position with the District for the 2005-2006 school year.

6.  The District advertises its open positions through various media soliciting applications from candidates. The District has a policy governing the application screening process.

7.  Open positions at the elementary level frequently bring in more than 100 applications.

8.  The District received...applications for the three available positions and, although not considered at the time, the application materials exchanged in discovery indicate that only 5 applicants were over 40.

9.  The District's typical hiring process was such that a committee of individuals would screen applications to narrow the field and then a separate interview committee would interview the highest scoring applicants.

10. The District's policy requires that the applicants...be screened "by a minimum of two (2) administrators. For professional positions, a combination of building and central office administrators may be utilized."

11. [After the individuals are screened, an] interview committee interviews the top scoring applicants and then makes recommendations to the School Board for employment offers.

---

parties indicated in brackets. Any proposed facts not contained within the followingrecitation of facts were found by the Court to remain disputed in the record or to be immaterial.

12. During the 2005-06 application process, [Snyder] was the sole person screening applications.

13. The District wanted the best qualified teacher for the jobs and Snyder in particular was seeking someone who was not only minimally qualified by State certification but who was open-minded and nurturing. [Snyder was also looking for someone who would be "willing to learn to teach reading in a new way [Balanced Literacy]."]

14. Snyder's view was that experience as a qualification could be a positive or a negative depending on the type of the experience that it was.

15. Referring to the District's screening policy, Snyder testified that "the screening committee should have been myself and the assistant superintendent and the assistant high school principal. They were all gone. I was the only one left."

16. On June 1, 2005, the District hired Dr. Michael F. Slavinski as a consultant and as Superintendent on July 1, 2005.

17. Dr. Jack Cunning [was the] Junior/Senior Principal at the District.

18. District policy required screeners to "tally the points for each candidate's application" and to prepare a "tally...indicating the point totals assigned by the administrators during this paper screen of candidates."

19. The policy required screeners to use a Screening Evaluation Form consisting of nine categories (Application Materials, Educational Background/GPA, Honors and Activities, Professional Memberships, Certifications, Professional Experience Technology, Other Work Experience, and Recommendations), each of which is assigned a point value.

20. In the 2005-06 screening process, Snyder alone decided how to break down each category and assigned a value to each of its component parts, applying his rubric to all of the screened applicants.

21. Although the Screening Evaluation Form and District policy attempted to objectify the paper screen process, Snyder conceded that with "people [he] knew [he] was probably more subjective than if its an application from a person that [he] never met in [his] life."

22. Plaintiff did not score high enough on her screening evaluation to warrant an interview. Snyder's paper screen of Melanie Higgins' application yielded a 47 out of a possible 128 points, thereby eliminating her from the interview process and consideration for hiring.

3

23. Higgins' application packet demonstrated that she met the [State certification requirements to teach.]

24. In 1990, Higgins earned a degree in elementary education, graduating with a 3.84 GPA from the Pennsylvania State University. The Commonwealth certified Higgins to teach elementary education in 1990, nursery school in 1992, and issued her a special education certificate of competency in 1998.

25. Higgins also earned an additional Bachelor of Science degree in Animal Husbandry from the Pennsylvania State University in 1980.

26. Prior to submitting her application, Higgins completed a variety of continuing education classes, including Balanced Literacy training....

27. At the time of the of her application, Melanie Higgins had 14 years of teaching experience, including 8 years of long-term substitute teaching for the District and other educational providers.

28. From 1992 to 1994, Melanie Higgins was a [sic] full time as a Head Start Home Visitor at Cen-Clear Child Services, where she planned and implemented activities for the classroom and home as well as developed goals for Individual Education Plans. From 1994-1998, Higgins was a full-time Early Intervention Teacher/Home Visitor with Cen-Clear Child Services, where she planned and implemented developmentally appropriate practices in the classroom for children ages 0-3.

29. In her six years serving the District, Higgins had never been disciplined, written up, or cited for misconduct of any sort.

30. Snyder had been the Principal at all times when Higgins was a substitute and had previously sat on interview committees with whom Plaintiff had previously interviewed.

31. Higgins' application packet contained numerous letters of recommendation, including one written by Elementary Principal Snyder and then Junior/Senior High School Assistant Principal Katherine Keefe.

32. Snyder wrote his letter of recommendation of May 3, 2005. In his letter, Snyder asked potential employers to "consider Melanie for any teaching position you may have available"

4

because "she has a good working relationship with other staff members", "relates well to children," and is "always willing to 'Pitch in' and help out when need arises."[2]

33.  At his deposition Snyder testified that the letter was a "form," and he was not trying to be as honest as possible when writing it. Mr. Snyder admitted to writing a standard letter for "anyone who asked for a recommendation."

34.  [Based on Snyder's informal observations of Higgins], it was Snyder's opinion that Higgins was an adequate substitute but was not an outstanding or exemplary teacher whom the District should have as a permanent teacher.

35.  [In his deposition, Mr. Snyder testified to his concern that Melanie Higgins was "hanging out" or "eating lunch" with teachers that opposed the Balanced Literacy program that the District had implemented.]

36.  [Upon questioning with regard to the opposing teachers being older and closer to retirement, he testified that he did not "want to paint with a broad paintbrush there because there were a good number of experienced teachers who were supportive of the position. But the ones who were not are probably in that category, as you had stated just now."]

37.  Snyder noted that Higgins was never openly oppositional to the Balanced Literacy curriculum, and he had not observed anything in the classroom that confirmed such a supposition.

38.  [All applicants that were passed on to the interview committee except Lane Sherick, screened higher than Higgins.]

39.  Snyder screened Deanna Genesi, a 24-year-old, at a 97. She held a Bachelor of Arts in Early childhood education, a 3.9 GPA, PA certification in Nursery-3rd grade, one year of substituting experience, and a summer as a Title I teacher.

40.  Snyder scored Tiffany Dugan, a 25-year old, at a 92. She held a Bachelor of Science in Elementary Education, a 3.63 GPA, Master of Education: Reading Specialist, a PA certification in K-6, and was a 4th grade teacher in Derry Township since 2000.

41.  Bethany Hoover, a 23-year-old, screened at a 83. She held a Bachelor of Science in Elementary Education, a GPA of 3.7, and was certified in K-6. She served as a full-time substitute teacher in 2004-2005 and a Title I instructor in the summer of 2005.

---

[2]It should be noted that Plaintiff's Appendix N did not include the referenced recommendation letters. Snyder's letter of recommendation was found in Defendant's exhibits, but a copy of Keefe's letter could not be located. Her deposition, however, does indicate that she wrote a letter on behalf of Higgins.

42. Snyder screened Allison Mowchan, a 26-year-old, at 78. She held a Bachelor of Science in early childhood and special education, a GPA 3.9, Masters of Education, and was certified K-12, Special Education, and Early Childhood. Mowchan was an emotional support teacher on CIU 10, Alternative Education Teacher at Pyramid Health Care and Moshannon Valley School District, and Special Instructor at Cen-Clear Child Services.

43. Jeremy Kendrick, a 25-year-old, screened at 63. He held a Bachelor of Science in elementary education, a GPA of 3.11, substitute taught from 2003-2005, and was a full-time substitute at the Central Pennsylvania ASD Academy.

44. Snyder screened Jamie Branstetter, a 23-year-old female, at 53. She held a Bachelor of Science in elementary education, a GPA of 3.68, and K-6 certification. Her classroom experience was limited to student teaching.

45. Jennifer George, a 35-year old, screened at 53. She held a Bachelor of Science in elementary education, a GPA of 3.83, and a Masters of Education. Her experience included Home Visitor in the Early Intervention Program and substituting at Cen-Clear from "2003-present," 3rd and 5th grade teacher from 1995-1998, 2nd grade teacher from 1993-1995.

46. ...Kenneth Veihdeffer, a 44-year-old, screened at 53. He held a Bachelor of Science in Elementary Education, a GPA of 3.9, and was certified K-6. Veihdeffer's experience included 2nd grade teacher 2004-2005, County Prison Literacy Teacher 2003-2004, CIU #10 substitute teacher 2003-2004, Substitute teacher/homebound teacher/Title I Jumpstart 2003-2004.

47. ...Glenn Caldwell, a 43-year-old, screened at 53, with a Bachelor of Science in elementary education, a GPA of 2.986, and certification K-6. Caldwell's experience included 5th grade teacher from 1999-2005, 4th grade teacher 1998-1999, and substitute teaching.

48. [Lane Sherick, a 23-year old, screened at a 30.] Sherick possessed a Bachelor of Science in Elementary Education. She was certified K-6 with classroom experience through student teaching.

49. Like all those Snyder recommended for interviews, Higgins held a Bachelors Degree in education. Higgins...also had a special education certificate of competency. ...Mowchan was also qualfied to teach special education. Mowchan, Dugan, and George also held a Masters in Education, [which neither Higgins or any of the other applicants possessed].

50. Two of the candidates (Hoover and Veihdeffer) Snyder recommended for interviews indicated training in Balanced Literacy. [Higgins had taken a Balanced Language five day class.]

6

51.  Mr. Snyder [testified that he] did not know the age of any applicant and, in particular did not know Plaintiff's age until she filed her EEOC charge in or about January of 2006....

52.  Out of the screening process, two applicants were chosen for interviews who were over 40, Ken Veihdeffer, date of birth 10/12/61 and Glenn Caldwell, date of birth 8/5/62, and Mr. Veihdeffer was ultimately hired for one of the full-time positions as the first choice of the interview committee.

53.  [Upon learning that she did not receive an interview], Higgins contacted School Board president Bob Holden and school board member Scott Magnetti, Snyder, and Dr. Slavinski to complain about not being given an interview.

54.  Higgins told Holden that she had not been given an interview and gave him a copy of her resume. Holden called Snyder and asked that Higgins be interviewed.

55.  Mr. Holden also asked the interview committee to interview Lane Sherick despite her low screening score because she was the daughter of his wife's business partner and Holden wanted to give her interview experience since she was newly graduated.

56.  Dr. Slavinski wrote a note to Snyder requesting that Snyder consider [Higgins] for an interview.

57.  Snyder made it clear to Holden that he did not think Higgins would be hired.

58.  During a meeting of the interview committee in the summer of 2005, the committee discussed Snyder's decision not to recommend Higgins for an interview. Snyder advocated against offering Higgins an interview, asserting that she was boring, had held students after school against school policy, and she had interviewed unsuccessfully in the past.

59.  Snyder told the interview committee that Higgins teaching style was "kind of flat and unaffected and dull."

60.  Snyder also told the committee about an incident involving two of Higgins' students that missed an afternoon bus in 1990, 15 years prior. According to Snyder, Higgins brought two students to his office after the buses departed, stating that they were misbehaving. Snyder recalled having to drive the students home.

61.  Higgins testified that the two students involved snuck back into the classroom as she walked the other students to the buses. She discovered the children shuffling through the teacher's desk (Higgins was a substitute) and brought them to Snyder's office, explaining to him what had happened and offering to make phone calls to their parents. Snyder indicated that he would take care of the situation himself.

7

62. Snyder recalled interviewing Higgins for a teaching position at least one prior time where she interviewed poorly and was not considered to be a strong candidate. Plaintiff testified that prior to the summer of 2005, she had applied for permanent teaching positions with the District on at least two...and perhaps as many as four occasions but...failed to procure a permanent job.

63. The interview committee relied upon Snyder's oral representations and the screen scores in tabling Higgins' application.

64. During the committee meeting, School Board President Holden pressed Snyder to explain his screening matrix, but related that Snyder was unable to do so and instead, Snyder responded by asking if there was anyone he wanted interviewed. Holden t estified that Snyder's explanation "just didn't make any sense" and that he was not convinced that "the system for screening applicants was completely objective or fair."

65. The two permanent positions were offered respectively to Kenneth Veihdeffer, age 43, and Lane Sherick, who was under age 40. The long-term substitute teacher [position]was originally offered to Tiffany Dugan who declined and was ultimately awarded to Bethany Hoover.

66. Higgins admitted that Tiffany Dugan was more qualified than she was and that Veihdeffer and Glen Caldwell were comparably qualified to Higgins, even in her own opinion.

67. Higgins was constrained to admit during her deposition that there was absolutely no way for her to prove that she would have obtained any of the jobs had she obtained an interview.

68. The District's Nondiscrimination in Employment/Contract Practices Policy [delegated responsibility for enforcement to the "Superintendent as the district's compliance officer."]

69. In the summer of 2005, Higgins complained to [Dr. Slavinski] about [Snyder] subjecting her to age discrimination by not giving her an interview.

70. Dr. Slavinski claims that he immediately informed School Board President [Holden] and secondary principal Dr. Jack Cunning of Melanie Higgins' age discrimination complaint.

71. [Holden] and Dr. Cunning dispute that Dr. Slavinski informed them of Higgins' complaint.

72. Step 2 of the District's Nondiscrimination Policy required an investigation by the building principal or compliance officer and the preparation of an investigative report in Step 3.

8

73. [Dr.] Slavinski did not know that he was the District's compliance officer at the time he received the Higgins complaint, nor was he familiar with the District's nondiscrimination policy.

74. On January 1, 2006 Higgins completed paperwork to dual file with the PHRC and EEOC. On March 7, 2006 Higgins' charges of discrimination were dual filed with the PHRC and the EEOC.

75. The EEOC issued a Notice of Charge of Discrimination on January 12, 2006.

76. In or about January of 2006, Higgins was advised by the EEOC that there was no age discrimination claim in light of, *inter alia*, the fact that the Board had interviewed and hired Kenneth Veihdeffer who was substantially similar in age to Higgins.

77. Higgins exhausted her State and Federal administrative remedies.

78. On September 26, 2006, Melanie Higgins filed a complaint of age discrimination with this Court.

## DISCUSSION

This matter concerns a complaint filed by Higgins, who was at the time of this action a substitute teacher for the District. The complaint alleges that Higgins was discriminated against under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621-634 and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-963 by the fact that she was not screened pursuant to appropriate factors for three open teaching positions during the summer of 2005. The result of such alleged discrimination was that Plaintiff did not have an opportunity to interview for the positions.

The Defendant argues that 1) the Plaintiff cannot establish her *prima facie* case; and 2) that Plaintiff cannot show any evidence "on which a reasonable jury could find that the reasons given by Snyder for Plaintiff['s] failure to be interviewed or hired were pretextual." Defendant's Motion ¶90. Plaintiff argues that 1) she has demonstrated both direct and disparate treatment evidence of age

9

discrimination; and 2) that the Defendant has failed to adequately rebut that evidence. Plaintiff's Motion ¶ 14.

The Plaintiff summarizes her theory of the case as follows: The Defendant wanted to hire younger teachers for open teaching positions and in order to accomplish this goal, the Defendant did not appropriately screen older applicants, thus denying them interviews. Plaintiff's Brief, pp. 1-2. Arguing the specifics of her case, the Plaintiff asserts that she has provided direct evidence that her age was a substantial factor in the decision not to hire her, therefore shifting the burden onto Defendant to prove that it would not have hired the plaintiff even if it had not considered age. *Id.* at 10-11. Plaintiff asserts that Defendant has failed to show that age was not relied upon in reaching its decision. *Id.* In the alternative, the Plaintiff argues that she has met the first three elements of the *McDonnell Douglas* analysis by showing that she was over 40, that she was not chosen for an interview, and that she was qualified to teach in any of the three positions. *Id.* at 11-14. Plaintiff further claims that the fourth element has been met because she possessed superior qualifications to the younger females who were granted interviews. *Id.* Finally, the Plaintiff claims that while Defendant has provided non-discriminatory reasons for her not being granted an interview, those reasons are not "legitimate" and therefore pretextual. *Id.* The Plaintiff also suggests that the District's response to her discrimination complaint was evidence of a guilty conscience. *Id.* at 14-15.

The Defendant summarizes its theory of the case as follows: The Plaintiff did not establish a *prima facie* case of age discrimination and even if she did, legitimate non-discriminatory reasons were set forth as to why she was not hired. Defendant's Brief at pp. 7-11. The Defendant contends

10

that Plaintiff was minimally qualified to teach but was not qualified for the positions for which she was applying. *Id.* Defendant further contends that "Plaintiff is unable to demonstrate that [Defendant] gave more favorable treatment to employees who were sufficiently young than Plaintiff in the hiring process" based on the fact that Mr. Veihdeffer and Mr. Caldwell were in their 40's when they were screened, interviewed, and in Veihdeffer's case, hired. *Id.* Defendant claims that Snyder's reasons for denying Higgins an interview were legitimate: that Higgin's teaching style was flat, dull, and non-nurturing; Higgins did not stand out as a particularly good substitute although she was adequate to fill the need; Higgins had mishandled an incident regarding the discipline of two boys while she was a substitute; Higgins had interviewed previously in the District and had interviewed poorly; and Plaintiff seemed to be influenced by teachers who were opposed to the District's balanced literacy curriculum. *Id.* at 12-20. Defendant further claims that there is no evidence of pretext and that Higgins cannot prove that she would have been hired for a permanent position had she been interviewed. *Id.* at 20.

At the outset, the Court notes that the PHRA and ADEA are interpreted similarly by both Pennsylvania state courts and federal courts. *See Kelly v. Drexel University*, 94 F.3d 102, 105 (3rd Cir. 1996). Therefore, the following analysis applies to both the ADEA and the PHRA claims.

The following standards are applied in ruling upon a motion for summary judgment:

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91 L.Ed.2d 265 (1986) ; Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all reasonable

11

inferences must be drawn in favor of the non-movant. *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638].

*Troy Chemical Corp., v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

Federal Rule of Civil Procedure 56 (c) states in pertinent part that judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes*, 398 U.S., at 158-159, 90 S.Ct., at 1608-1609. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.Rule Civ.Proc. 56(e) (emphasis added). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587(1986)(internal citations omitted)(footnote omitted).

Evidence of a ADEA violation can be presented through either direct evidence or indirect evidence of such discrimination. *Monaco v. American General Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004). If proven through direct evidence, then the "mixed motives" analysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) is utilized. The term "direct evidence" has been defined as "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the plaintiff's age in reaching their decision." *Fakete v. Aetna, Inc.,* 308 F.3d 335, 338 (3d Cir. 2002) (*quoting Conners v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) ) (*quoting Price Waterhouse,* 490 U.S. at 229). Such evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing the bias acted on it" when he made the challenged employment decision. *Fakete,* 308 F.3d at 338. The direct evidence must reveal a sufficient discriminatory animus making it unnecessary to rely on any presumption from the *prima facie* case to shift the burden of production. *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002), *citing Conners, supra.*

If proven through indirect evidence, the burden shifting analysis found in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) is used to analyze the plaintiff's allegations. *Id.* Under the

13

*McDonnell Douglas* framework for the purposes of summary judgment motions, first, the Plaintiff must establish a *prima facie* case of discrimination by meeting the following four elements:

(1) was a member of a protected class (*i.e.* he or she was forty years of age or older);
(2) was qualified for the position at issue;
(3) suffered an adverse employment action; and
(4) was replaced by a sufficiently younger person [who was similarly situated], raising an inference of age discrimination.

*Anderson v. Consolidated Rail Corporation,* 297 F.3d 242 (3d Cir. 2002)(citing *Showalter v. University of Pittsburgh Med. Ctr.,* 190 F.3d 231, 234-235 (3d Cir. 1999)). At the second step, the burden of production shifts to the defendant to put forth a "legitimate nondiscriminatory reason" for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997)(citations omitted). If a defendant demonstrates such a reason, step three in the analysis is attained; and if the defendant fails to meet this burden, judgment is entered for the plaintiff. *Id.* The Defendant's burden is "rather light" and "it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994); *Monaco v. American General Assur. Co.,* 359 F.3d 296, 300 (3d Cir. 2004) and *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 n.2 (3d Cir.1997)(citing *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994)), respectively. Should the analysis reach step three, "[t]he plaintiff may then survive summary judgment or judgment as a matter of law by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.*

14

For her claim that direct evidence of discriminatory animus exists, Higgins relies on the fact that Snyder considered criteria outside of the application packet and that this was against school policy. There is no evidence to suggest that the school policy limited consideration of application materials to the "four corners" of the document. In fact, Snyder testified that limiting the screening to application materials was not practical and was not the way that the process was handled. Higgins suggests that these improper procedures led Snyder to consider the fact that Higgins' tended to spend time with teachers who opposed the balanced literacy curriculum. Higgins further suggests that Snyder stereotyped older teachers by suggesting that it was mainly older teachers who were opposed to the curriculum changes. Snyder testified that the balanced literacy curriculum was important to him. In his deposition, Snyder testified to his concern that Higgins was "hanging out" or "eating lunch" with teachers that opposed the Balanced Literacy program that the District had implemented.

Snyder further testified as follows:

> And at that time, a small, but vocal group of teachers decided, well, this isn't how we did it 20 years ago and we're not going to change; we're going to keep teaching reading the way we were. And there was like this mini-revolt going on in the school, and some people were more than willing to learn and institute the new program, others were dragging their heels, some were on the fence and in between, and of course, all of the personal relationships of the people got in the way too.
>
> People would sometimes actually support the reading, but their friend didn't, so they had to pretend that they didn't like the new reading program. It was a real colossal tough five years going on there.

Deposition of Snyder, pp. 144-145.

15

Upon questioning with regard to the opposing teachers being older and closer to retirement, Snyder testified that he did not "want to paint with a broad paintbrush there because there were a good number of experienced teachers who were supportive of the position. But the ones who were not are probably in that category, as you had stated just now." There is no suggestion by the above testimony that Snyder was discriminating against older teachers on the whole. He plainly stated that there were plenty of experienced teachers who did support the new reading program and he also stated that the group that did not was small. Snyder's observations of Plaintiff's behavior made him believe that she fell into the group that opposed the curriculum. She could have eaten lunch with an experienced group of teachers who were not opposed to the curriculum causing Snyder to draw a different inference. Therefore, this is not sufficient direct evidence of discrimination to allow a jury to find that the decision-makers placed a substantial negative reliance on the Plaintiff's age in reaching their decision.

Since the Plaintiff's "direct evidence" argument fails, the Court will now turn to plaintiff's argument of disparate treatment under the *McDonnell Douglas* test. With regard to the first factor necessary for a *prima facie* showing of discrimination under *McDonnell Douglas*, the District concedes that Plaintiff was forty-eight (48) years of age when she was screened during the summer of 2005. It is also not disputed that plaintiff was of the requisite age when she learned that she was no longer being considered for the teaching positions. Additionally, under the second factor, the District concedes that Plaintiff was minimally qualified to teach Elementary Education as evidenced by her teaching certificate. However, they contend that she was not qualified according to the standards set forth by Snyder and therefore did not meet the requirements.

16

The District does not counter Higgins' basic qualification for the teaching positions. The Third Circuit has decided that to determine a plaintiff's qualifications for the purposes of proving a *prima facie* case, an objective standard is used. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). "[W]hile objective job qualifications should be considered in evaluating the Plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to" consideration of whether the employer's nondiscriminatory reason for discharge is pretext. *Sempier*, 45 F.3d at 729, *quoting Weldon v. Kraft Inc.*, 896 F.2d 793, 798 (3d Cir. 1990). "Thus, to deny the plaintiff an opportunity to move beyond the initial stage of establishing a *prima facie* case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext." *Id. quoting Weldon*, 896 F.2d at 798-99. In the instant case, Higgins had a state certification to teach in elementary and nursery schools. She had received a degree in education from the Pennsylvania State University. She also had 14 years of teaching experience in various positions. Therefore, objectively, Higgins was qualified for the jobs.

With regard to the third factor, the District concedes that Higgins was not interviewed or hired in the summer of 2005 amounting to an adverse employment action. Finally with regard to the fourth element, Defendant contends that Plaintiff is unable to demonstrate that it gave more favorable treatment to employees who were sufficiently younger than Plaintiff during the hiring process. In *O'Conner v. Consolidated Caterers Corp.*, 517 U.S. 308, 313 (1996), the Supreme Court held that the fourth element of a *prima facie* case under the ADEA "cannot be drawn from

17

the replacement of one worker with another worker *insignificantly* younger." Although no uniform rule exists, it is generally accepted that when the age differential between the person who receives the job and the person who does not get the job is less than five to six years, the new employee is not considered "sufficiently younger," and therefore, no *prima facie* case is established. *See Gray v. York Newspapers,* 957 F.2d 1070, 1087 (3d Cir. 1992); *Bernard v. Bethenergy Mines, Inc.*, 837 F. Supp. 714, 716-17 (W.D.Pa. 1993), *aff'd* 31 F.3d 1170 (3d Cir. 1994); *Hill v. Bethlehem Steel Corp.*, 729 F. Supp. 1071, 1074 (E.D. Pa. 1989) *aff'd* 902 F.2d 1560 (3d Cir. 1990).

It is undisputed that Plaintiff was forty-eight (48) years old when she applied for the teaching positions at the District. It is also undisputed that Kenneth Veihdeffer, who was forty-four years old and Glenn Caldwell who was forty-three years old were both given interviews and Veihdeffer was eventually hired. Although Plaintiff claims that she was screened lower than all of the younger female applicants passed on to the interview committee, gender does not play a role in claims under the ADEA. Therefore, the age of each person interviewed must be considered, and in this instance, two persons who were interviewed are within four or five years of the Plaintiff. Plaintiff further concedes that Caldwell and Veihdeffer possessed comparable qualifications to herself. The fact that the District filled one of three positions with a member of the protected class negates the inference that younger applicants were given more favorable treatment than those over the age of forty. *See Sadler v. Marriott Intern., Inc.*, Civil Action No. 98-762, 1999 WL 357381 * 3, 1999 U.S.Dist.LEXIS 8246 *7 (E.D.Pa. June 3, 1999)(*citing Falkenstein v. Neshiminy School Dist.*, Civil Action No. 96-5807, 1997 WL 416271 *5, 1997 U.S.Dist.LEXIS 10324 *12-14 (E.D.Pa. July 14, 1997).

18

Even assuming that Plaintiff had satisfied the fourth prong of the *prima facie* case for age discrimination, the District has demonstrated a legitimate non-discriminatory reason for the adverse employment decision. An employer must be given substantial discretion to "choose among equally qualified candidates, provided [that] the decision is not based upon unlawful criteria." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242 (1989); *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 332 (3d Cir. 1995). A plaintiff's own view of her qualifications and performance is not a relevant issue in a discrimination case. Instead, it is the perception of the decision-maker. *Burdine,* 450 U.S. at 259; *Brewer*, 72 F.3d at 331. Plaintiff claims that Snyder ignored the District's policies and practices in his governance of the screening process. However, it is undisputed the District gave Snyder full responsibility for screening teacher applications in order to pass a group of initial interviewees on to the interview committee. Despite there being a policy in place normally requiring a committee to screen, the school district chose to give that responsibility to Snyder who in turn became the decision-maker. Likewise, it is undisputed that Plaintiff screened lower than all but one of those who were eventually given interviews.

The Plaintiff and Snyder knew one another because Plaintiff had often substituted in Mr. Snyder's school building. Snyder gave several reasons as to why Plaintiff should not be granted an interview. They included: that Plaintiff's teaching style was "flat, unaffected, and boring"; that based on his observations, Plaintiff was an adequate substitute but was not an outstanding or exemplary teacher whom the District should have as a permanent teacher; that Plaintiff appeared to be opposed to the Balanced Literacy curriculum; that Plaintiff had mishandled an incident

19

involving two students 15 years prior; and that Plaintiff had interviewed poorly in the past. These reasons are facially legitimate non-discriminatory reasons that Plaintiff was not hired.

In order to discredit the employer's proffered reasons, the Plaintiff must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the District so that the fact finder could legitimately conclude that each reason was a *post hoc* fabrication; or 2) allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Fuentes v. Perskie,* 32 F.3d 759, 761 (3d Cir. 1994). Plaintiff cannot satisfy that burden by showing that the employer's decision was "wrong or mistaken", since the factual dispute at issue is whether the age of the applicant motivated the employer, not whether the employer is "wise, shrewd, prudent, or competent."*Ezold v. Wolf-Block Shorr & Solis-Cohen,* 983 F.3d 509, 533 (3d Cir. 1992). "Rather, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence...."*Olson v. General Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir. 1996) (*quoting,* Fuentes, 32 F.3d at 765).

Snyder informally observed Plaintiff in the classroom (formal observations were limited to permanent teachers) and was capable of observing her teaching style as he was the principal of the elementary school. No other individual who testified with regard to Plaintiff's skill as a substitute teacher observed her in the classroom and their opinions suggested that the Plaintiff did not stand out as a substitute one way or another. While Plaintiff received favorable reviews of her teaching by Dr. Slavinski, Plaintiff admits that his observations of her took place after the hiring process in

20

2005, as Slavinksi was new to the school in June of 2005 and would not have had an opportunity to observe Higgins.

Plaintiff's attempt to undermine the District's proffered legitimate reason through reference to recommendation letters by Snyder and Carolyn Keefe, the assistant principal for the middle/high school, for positions with other school districts does not suggest pretext. Both Snyder and Keefe wrote many recommendation letters for a number of individuals. In fact, Snyder attached many letters similar to the one he wrote for Plaintiff as Exhibit F to his Motion for Summary Judgment Appendix. Snyder also testified that the letters were often a form and that if asked to write the letter again it would likely say the same thing. It should also be noted that Keefe had left the District by the time of Plaintiff's application for the positions.

Additionally, Plaintiff admitted to remembering details of the incident with the two boys in her classroom. While this incident did not occur close in time to the hiring process, it is not the responsibility of the Court to determine whether Snyder's consideration of this incident was prudent. The incident occurred and he could consider it. Further, Plaintiff argues the Snyder could only recall one past interview where Plaintiff had performed poorly and that Lane Sherrick had no interview experience and had screened poorly and was still granted an interview. However, it is clear from the record that Holden, the School Board President, requested that the interview committee interview Sherrick to give her interview experience. There is no evidence that Snyder suggested Sherrick over Higgins to the interview committee despite Sherrick's screening scores.

Finally as was discussed above, Snyder's testimony about his observances of Plaintiff and her allying with the group opposed to the balanced literature curriculum does not show that Snyder

21

was somehow using Balanced Literacy as a proxy for age. He testified that there were many experienced, older teachers who were not opposed to the curriculum, but there was also a smaller group who were not in support of the curriculum. Therefore, Plaintiff has failed to show that all of the District's legitimate non-discriminatory reasons were pretext.

An appropriate order follows.


**AND NOW**, this 17th day of September, 2008, in consideration of the Defendant's Motion for Summary Judgment (Document No. 23) and the Plaintiff's Motion for Summary Judgment (Document No. 26) and in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion is GRANTED and the Plaintiff's Motion is DENIED. IT IS FURTHER ORDERED THAT judgment is to be entered for Defendant against the Plaintiff and the Clerk of Court is to mark this matter closed.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**